Shaw, C. J.
The difficulties of this case are many and obvious; but they are difficulties arising from the great length *258 of time which has elapsed since the facts occurred, upon which the right depends, extending over half a century, the great number of those facts, and the imperfect state of the deeds by which they are now sought to be shown.
It seems manifest that some deeds have been lost, or that agreements were made, which should have been and were probably intended to be expressed by deed, but that through some unknown cause, such deeds were never made, or never recorded.
It is singular, that no trace is found of the settlement of. Daniel Russell’s estate, either by will, or as intestate; or of the manner in which his interest in this large estate of his father was disposed of, in his lifetime, or at his decease. But we presume that search has been made at the proper sources, and nothing found to throw light on this subject. It seems quite certain that his share had, by some means, come to his brother John Miller Russell before the partition in 1810, because shares were assigned to the two daughters, no share was assigned to any person ostensibly claiming under Daniel, but two distinct shares and quarter parts were assigned to John, without objection on the part of anybody, either the other heirs, or any third party. But how or by what means, Daniel’s original share, in his lifetime, or after his decease, came to John, is left wholly unexplained.
By the deed of Daniel RusseE to John L. SuEivan, of the 6th of May, 1800, he conveyed the whole or the greater part of his share in the reversion of the lands, assigned, to the widow as dower.
By another deed of the same to the same, November 22d, 1802, he conveys his reversion in the fourth part of the Three Pole Lane Farm, a part of the same reversion. Why this second conveyance, if he already held the same and more under the former, we have no means of knowing. It is said this raises a presumption, that SuEivan had in the mean time conveyed it back by some deed not now appearing. This would account for it; but perhaps it is too much to say, that it is sufficient proof of an intermediate deed; because it may be accounted for by other hypotheses, as weE as by this.
*259 It seems that about the time Daniel gave his deed to J. L. Sullivan, J. M. Russell also, on the 29th of April, 1800, gave a deed to Sullivan in nearly the same terms, and that after-wards, June 29th, 1801, Sullivan and wife conveyed it back to J. M. Russell. Perhaps Sullivan and wife reconveyed to Daniel, about the same time, but no such deed is found.
If both of Daniel’s deeds remained in force, without any intermediate deed back, then so far as we can now see, nothing passed by the second deed from Daniel to J. L. Sullivan, because the whole interest and estate, which it purported to convey, was in the grantee before. But if there was an intermediate deed, which revested the whole of Daniel’s interest in the reversion in John L. Sullivan, the theory of the tenant is, that by the second deed from Daniel to J. L. Sullivan, he conveyed his one fourth in the reversion in the Three Pole Lane Farm; so that Sullivan became seized of it in his own right, and so remained up to the time of the levy of tenant’s execution, nearly fifty years. But this is inconsistent with the uncontroverted facts. The main fact is, that some years after the decease of Daniel, and after the decease of the widow, when the estate in reversion came to be an estate in possession, and the heirs came to make partition, John Miller Russell was recognized, without objection, as the owner of two full fourth parts, and in the informal partition, two distinct quarter parts were assigned to him. As already stated, one full fourth was assigned to each of the wives of John L. and Richard Sullivan, so that after assigning to J. M. Russell his own share or quarter part, another full share was assigned to him; and this, from whatever cause, or by whatever channel it came to him, was Daniel’s original share. We are therefore compelled to presume the legal means, the necessary legal means, by which it came to him, by will, by deed or deeds mediate or immediate, by levy of execution, or some legal means by which real estate may be transmitted. But when we are compelled to presume some means to account for the fact, that John M. Russell then had and was allowed to hold Daniel’s share, we must presume enough to account for the whole fact. The fact to be accounted *260 for is,that he claimed to hold Daniel’s whole quarter; in presuming a conveyance, then, we must presume such conveyance as will account for the entire fact, that is, a conveyance of Daniel’s entire quarter. But if Daniel’s entire quarter part had come to J. M. Russell, there must have been some conveyance, by which any part of the estate of Daniel, which had at any time come to J. L. Sullivan, had been parted with by him; and therefore, either he must have conveyed it to John M. Russell himself, by some non-appearing deed, or he must have reconveyed to Daniel any interest in his quarter, which he had acquired from him, and then Daniel must have conveyed it entire to John Miller Russell.
The theory of the tenant requires us to presume a reconveyance of the quarter part of the whole reversion by John L. Sullivan to Daniel Russell, between the two deeds of Daniel Russell to him, which does not appear, and that Daniel, after having by his second deed conveyed his interest to J. L. Sullivan, in the Three Pole Lane Farm, which does appear, then by another non-appearing deed conveyed his reversion generally to John Miller Russell, excepting his reversion in the Three Pole Lane Farm. This requires us to presume two non-appearing deeds, and the last containing a very special exception. If, according to the tenant’s theory, John L. Sullivan reconveyed to Daniel the reversion generally, and then Daniel conveyed his reversion in the Three Pole Lane Farm alone to Sullivan, such deed being but of part of an estate in-common in reversion would be voidable as against the co-tenants ; then, if in that state of Daniel’s title, after making such voidable conveyance of part of his reversion, he had made a conveyance of his reversion generally to his brother John, without excepting his conveyance of part to Sullivan, it would effectually defeat the conveyance to Sullivan, and vest the entire quarter in John Miller Russell. We therefore repeat, that in order to vest any estate in Sullivan in his own right, by means of this conveyance of Daniel to .lira in 1802, we must not only presume an intermediate reconveyance of the reversion generally from Sullivan to Daniel, but also, after Daniel’s second deed to Sullivan in *261 1802, of his reversion in the Three Pole Lane Farm alone, we must presume a conveyance to John M. Russell with the special exception of such voidable conveyance to Sullivan.
But even such presumption would not entirely account for the facts, which necessarily call for and demand some presumption. Those facts are, that on the partition, J. M. Russell took the entire quarter of Daniel, which he could not have done, if he had taken a deed from Daniel with an exception in favor of Sullivan out of that quarter. On the contrary, he would have taken less than an entire quarter, and the case would have shown that there was a share in the estate to be divided, belonging to J. L. Sullivan, to be recognized and set off to him in his own right.
The case then at the partition would have stood thus: The estate which had been in reversion had become an estate in possession, and was to be divided. According to the theory of the tenant, Sullivan had acquired from one of the tenants in common his quarter part in one of the parcels constituting an entire estate in common.
It is conceded that this conveyance was invalid and void, at the election of the other tenants in common. Peabody v. Minot, 24 Pick. 329. They meet to divide the whole estate. It was for them to overlook and set aside this conveyance of part by metes and bounds to Sullivan, and divide the whole as if it had not been made; or, at their option, they might respect and confirm it. If they intended to respect and confirm it and give it force and validity, as they might, two consequences would have followed; first, John M. Russell would not have been admitted and recognized as holder of the entire quarter of Daniel, and secondly, Sullivan would have been recognized as a tenant in common, and a share would have been assigned to him, to hold in his own right in severalty. But by the evidence it is clear, that John M. Russell was recognized and admitted by the other tenants in common, including Sullivan, acting in right of his wife, as holder of Daniel’s original entire quarter, and that no claim was made or share assigned to Sullivan, in his own right. The fact therefore either disproves the special deeds, necessary to be *262 presumed to make out the proposed state of facts, leaving an estate in Sullivan in his own right; or, it proves an election on the part of the co-tenants to regard the deed of Daniel Bussell to Sullivan, of his reversion in part of the estate in common, as null and void, as they had a right to do, and by making a partition and assigning the whole quarter to J, M. Bussell and malting no assignment to Sullivan, they avoided and effectually annulled it. So that after that partition, any voidable claim, which Sullivan had in his own right, by force of the second conveyance of Daniel to him, was effectually terminated, if it had not been otherwise conveyed by Sullivan, either directly to J. M. Bussell, or by some intermediate deed.
It becomes necessary to presume the execution and existence of one or more deeds, to account for the admitted facts; and to do this, we must presume such conveyances, as would in some form vest the entire quarter part, originally in Daniel at the death of his father, in his brother John M. at the time of the partition; and whatever these may have been, they must have been such as to extinguish or bar any claim, right or title, which John L. Sullivan may be presumed to have then had in his own right, in that one quarter part; and if he had no such right in 1810, he had none in 1850, when the tenant levied his execution on this estate.
But there is another point of view, in which the evidence may be regarded, which appears to us decisive for the demand-ant.
The theory of the tenant is, that by the deed of Daniel Bussell to Sullivan in 1802, the latter acquired an interest in one quarter of the reversion of the Three Pole Lane Farm, which became an estate in possession at the decease of the widow; that all the entries, exclusive occupation, pernancy of profits and the like, by the demandant, were those of co-tenants, by which John L. Sullivan as a co-tenant was not ousted, and although he made no entry or claim of profits, his seizin remained and he was not ousted; and therefore that the estate was liable to be taken on execution for his debts. This supposes that John L. Sullivan was seized during the whole period from 1810 to 1850. To meet this, we think that the *263 acts, doings and declarations of John L. Sullivan, as privy in estate, in regard to his seizin, notice to him of the exclusive claim of Richard and his wife, and his acquiescence, are all competent evidence, being such as occurred before the levy of execution. The affidavit therefore of John L. Sullivan is of great importance in the present case. He states the informal partition made in 1810, and the reason why it could not be carried fully into effect by deeds, on account of the unfortunate condition of Mrs. John L. Sullivan, one of the heirs. He annexes a paper made by the commissioners, by which it appears, that the whole reversionary estate then remaining was divided, except one quarter part of the Three Pole Lane Farm. Of this farm, three quarters were taken into the general partition, as well to constitute the aggregate to be divided, as in the property of Mrs. Richard Sullivan, to whom it was assigned. With this exception, the whole reversionary estate was divided into four parts, and estimated in value; and allowing something for equality of partition, an entire fourth was assigned to the right of each Mrs. Sullivan, and two parts or quarters, specially designated and distinguished, were assigned to John M. Russell. No reason is assigned by the commissioners in their certificate, why the quarter of the Three Pule Lane Farm was not divided. But Sullivan in his affidavit, made before the tenant had levied his execution, and made for another and distinct purpose, to be laid before the legislature, in order to obtain a confirmation, and therefore above suspicion of being made for this occasion, says, that by agreement of all the parties, including himself, that one quarter of the Three Pole Lane Farm, not included in the partition, was agreed to go to Mr. and Mrs. Richard Sullivan as purchasers, at an agreed valuation in money, and that they paid the other heirs their respective shares of such money.
It appears, then, that by consent of the other heirs, Mr. and Mrs. Richard Sullivan entered on the estate as owners, claiming, whether by valid title or not is immaterial, but in fact claiming to hold the whole estate in severalty. This was done with full notice to John L. Sullivan, and therefore as *264 against him, amounted to a constructive disseizin. After such entry by Richard Sullivan, his exclusive, adverse and uninterrupted possession, as stated in the facts, and the entire acquiescence of John L. Sullivan, under circumstances of embarrassment and insolvency, without claim, are sufficient proof both of a non-appearing grant, and also of an ouster, continued until all right of entry was barred, before the levy of the tenant’s execution. Judgment for the demandant.